IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION


| | | |
|---|---|---|
| **FLOYD ROSS** | | **PLAINTIFF** |
| VS. | **CASE N. 4:04CV002334 JMM** | |
| **DISABILITY RIGHTS CENTER, INC.** | | **DEFENDANT** |
| | | |
| **DELPHENA QASIM** | | **PLAINTIFF** |
| VS. | **CASE NO. 4:05CV000069 JMM** | |
| **DISABILITY RIGHTS CENTER, INC.** | | **DEFENDANT** |

**ORDER**

The above styled cases were consolidated for purposes of trial and tried to the Court between the dates of May 15 and May 19, 2006. Based upon the evidence adduced at trial and the arguments of counsel in their briefs, the Court finds that plaintiffs have failed to meet their burden of proving either race discrimination or retaliation for engaging in a protected activity and judgment will be entered in favor of the defendant in each case.

Plaintiff Floyd Ross brought his action alleging racial discrimination under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. 1981. Ross alleges that he was discriminated against based upon his race when he was not hired for an Advocate/Investigator position by Disability Rights Center ("DRC").

Plaintiff Delphena Qasim brought her action alleging discrimination and retaliation under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. 1981. Qasim alleges that DRC, her employer, retaliated against her after she complained about Ross not being hired for the

1

Advocate/Investigator position by first attempting to demote her and by eventually terminating her. Qasim also alleges racial discrimination causing a hostile environment and termination.

Both plaintiffs sought compensatory damages and injunctive relief. Each plaintiff established a *prima facie* case creating a rebuttable presumption of discrimination.

Ross established that (1) he belonged to a racial minority, African American; (2) he applied for a job for which he was qualified; (3) despite his qualifications he was rejected and (4) after he was rejected a white applicant was hired.

Qasim established that (1) she belonged to a protected group, African American; (2) she was qualified for the position she held; (3) she was subjected to a hostile environment and then terminated; and (4) circumstances raised an inference of wrongful discrimination.

Defendant offered legitimate nondiscriminatory reasons for not hiring Ross and for terminating Qasim and the ultimate burden remained on the plaintiffs to prove race discrimination and retaliation. This they failed to do and their claims must fail.

At the outset, it should be noted that both plaintiffs made credible witnesses and impressed the Court with their sincerity in believing that discrimination occurred. The Court was just as impressed that the defendant is an organization committed to a diverse staff and whose laudable mission was to protect the disabled and to give preference in hiring to minorities or people with special needs. This goal is reflected by the demographics of the work force and the historical hiring practices.

Ross claims that he was denied the position of Advocate/Investigator because of his race and relies entirely on a statement by Susan Pierce, a member of the selection team, that " if he was chosen she would be the minority on the Quality Assurance Team."

Qasim, another member of the selection team interpreted this as a racial comment and testified that Pierce also said that "there was no way that she would agree to hire a black man." Others had a different view of the statements. Pierce said it was only made in jest as a response to others saying they had been minority members of the Quality Assurance Team. Joyce Soulari, the third member of the selection team did not consider the statement racial in nature and Nan Ellen East, director of the Disability Rights Center agreed that the statement had no significance.

The most compelling proof is the fact that Pierce rated Ross higher than Trevor Arnett, another applicant, and concurred in the recommendation that Ross be given first consideration for the job. It was only when Eddie Miller, an African American employee of the Disability Rights Center mentioned to Pierce that he had concerns about Ross and in particular his verbal abuse of disabled persons, that East placed Arnett ahead of Ross.

East made it clear in her testimony that the ability of staff to communicate and connect with the disabled persons they served was of paramount importance to her and that the conduct of Ross as reported by Miller raised a "red flag" in her mind which caused her to focus her attention on Arnett. Since he also came recommended by the interview team and his references were satisfactory the job was given to Arnett.

Ross was not able to provide any evidence to convince the Court that the stated reasons for hiring Arnett were merely a pretext and he fails in meeting his burden of proving discrimination.

Qasim claims that defendant retaliated against her for complaining about the treatment of Ross by first demoting her to the Information Services Team and then terminating her. She also alleges that defendant created a hostile work environment and disciplined her in a disparate

3

manner from other employees.

Defendant responded that Qasim was terminated because of deficiencies in her job performance, and more specifically, that she was unprofessional in her dealings with facilities which cared for the disabled and in failing to properly document her files.

It was clearly established by DRC that proper file documentation is critical to the agency to comply with federal requirements and to insure federal funding.  Although Qasim denied that her documentation was any worse than other white employees, the Court was persuaded by the testimony of Jan Baker and Dana McClain of just the opposite.  Qasim was counseled on several occasions about the need for improvement and even told that if no improvement occurred she could be terminated.  The situation was exacerbated in an audit which prompted a review of Qasim's files and led to the conclusion that she had more documentation issues than all other employees combined.  This was deemed a sufficient basis for termination by Jan Baker and Nan Ellen East in addition to other problems that Qasim had interacting with her supervisors and co-employees.  Based on these ongoing performance problems she was terminated on September 2, 2004.

Qasim offered evidence that other employees had documentation problems, had relatives who visited in the agency or who had garnered complaints from disabled care facilities, but none of these compared in magnitude or frequency so as to raise an inference of disparate treatment.

Qasim also contends that an attempt to transfer her to the Information Services Team for Quality Assurance from the Quality Assurance Team would have been a demotion and cost her travel pay.  The reason for the attempted transfer was Qasim's inability to get along with Susan Pierce, and at one time, Qasim requested the transfer.   A  move would not have changed

Qasim's pay or working conditions and was considered only a lateral transfer. Qasim has failed to meet the burden of proving retaliation or race discrimination and her claim will be denied.

The Court makes the following findings of fact and conclusions of law as to plaintiff Ross.

Findings of Fact

1. Defendant Disability Rights Center ("DRC") is a private non-profit organization. The State of Arkansas has designated DRC the independent rights protection and advocacy system for persons with disabilities in Arkansas. DRC operates under authority outlined in federal law and is funded primarily by the federal government.

2. Plaintiff Ross is an African American male.

3. In March of 2004, DRC advertised for an Advocate/Investigator position. The position required excellent written and oral communications skills.

4. The applications were screened and ranked based on objective criteria. The highest ranking candidates were selected to interview.

5. Plaintiff Ross applied for the Advocate/Investigatory position. In the initial screening, Ross ranked seventh and was selected for an interview. Trevor Arnett ranked first and was also selected for an interview.

6. The interviews were conducted by a three person panel consisting of Delphena Qasim, Susan Pierce and Joyce Soulari.

7. Each candidate was asked the same series of questions and their responses were separately scored by each member of the interview panel. Each candidate had three scores. The scores were combined. The candidate with the highest combined score was Ross. The person with the

second highest combined score was Trevor Arnett.

8. The interview panel initially recommended both Ross and Arnett to Executive Director Nan Ellen East. She told the panel that they could only recommend one candidate and they recommended Ross. Prior to an offer being extended and pursuant to DRC's hiring practices, Ross's references were checked. Jan Baker is the individual that called Ross's references. When Baker checked Ross's references, she did not know he was African American.

9. One of Ross's references told Baker that Ross's communication skills in his every day interaction with clients "could be worked on a bit."

10. Eddie Miller, an African American employee of DRC, told Susan Pierce that he had concerns about hiring Floyd Ross. He witnessed Ross being verbally abusive to a disabled person in a work shop.

11. Baker and Pierce discussed the concerns regarding Ross. Baker told Pierce to speak with the other members of the team and get their input and recommendations. Pierce spoke with Qasim who expressed some concern and suggested contacting Ross directly. This suggestion was rejected. Qasim then left the office on business. Qasim's initial reaction was understood by DRC as an expression of concern and an acknowledgment that there was potentially a problem. The third member of the interview team, Soulari was contacted, and she recommended hiring Arnett. East was again consulted. She told Pierce to contact Qasim to see if she had any additional input. East also asked Pierce to call Arnett's references.

12. East attached a lot of importance to the ability of staff to relate to, and communicate with disabled persons, and that a problem in this area would be a definite problem with employing such a person.

13. With good references and two out of three members of the interview team strongly in favor of Arnett, East decided to offer Arnett the position.

14. Arnett received a starting salary of $25,000.00. At the time of Arnett's hiring, Ross was earning $28,000.00 at his place of employment. He continued to earn in excess of $25,000.00 for most periods up to the date of trial and sustained no loss of income as a result of not receiving the job of Advocate/Investigator at DRC.

15. Ross testified to having emotional distress for not having been selected and claimed to have consulted his primary care physician. This was not corroborated by the doctor's medical records.

## Conclusions of Law

16. DRC was Ross's employer as that term is defined by Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.

17. Ross established a *prima facie* case of discrimination or retaliation under Title VII of the Civil Rights Act of 1964 or 42 U.S.C. § 1981.

18. Defendant has stated a legitimate and nondiscriminatory reason for its decision to not hire Ross.

19. Ross has failed to prove that DRC reasons are a pretext for intentional discrimination based on race.

20. Ross has failed to prove that DRC's failure to hire him as a Advocate/Investigator was motivated in whole or in part by his race.

The Court makes the following findings of fact and conclusions of law as to plaintiff Qasim.

## Findings of Fact

1. DRC is a private non-profit organization. The State of Arkansas has designated DRC the independent rights protection and advocacy system for persons with disabilities in Arkansas. DRC operates under authority outlined in federal law and is funded primarily by the federal government.

2. Qasim is an African American female. She was hired by the DRC on August 5, 2002 as an Advocate/Investigator. Her primary responsibilities included monitoring mental health facilities for suspected abuse, neglect and rights violations.

3. As part of her job, Qasim was required to document each contact with the mental health facilities she was monitoring. This documentation is required by DRC's federal agency funding sources and was considered a very important duty by her supervisors.

4. Qasim was not properly documenting her monitoring activities. In some instances, there was no documentation at all. Qasim was counseled by DRC regarding her documentation in January of 2004 and again in March of 2004. She was told that if she did not improve her documentation, she would be terminated. (Def. Ex. #13).

5. DRC received complaints of unprofessional and disruptive behavior regarding Qasim from several facilities.

6. Qasim and co-worker Susan Pierce had a contentious relationship. Due to Qasim's relationship with Pierce, Qasim requested a transfer from the Quality Assurance Team to the Information Services Team. DRC was unable to accommodate Qasim at the time the request was

made.

7. In March of 2004, DRC advertised for an Advocate/Investigator position. The applications were screened and ranked based on objective criteria. The highest ranking candidates were selected to interview.

8. The interviews were conducted by a three person panel consisting of the Qasim, Pierce, and Soulari.

9. Each candidate was asked the same series of questions and their responses were separately scored by each member of the interview panel. Each candidate had three scores. The scores were combined. The candidate with the highest combined score was Ross. The person with the second highest combined score was Arnett.

10. The interview panel initially recommended both Ross and Arnett to Excutive Director East. She told the panel that she did not have the resources to hire two and that they could only recommend one candidate. They recommended Ross. Prior to an offer being extended and pursuant to DRC's hiring practices, Ross's references were checked. Jan Baker is the individual that called Ross's references. When Baker checked Ross's references, she did not know he was African American. The references were generally considered satisfactory.

11. Eddie Miller, an African American employee of DRC, told Susan Pierce that he had concerns about hiring Floyd Ross.

12. Baker and Pierce discussed the concerns regarding Ross. Baker told Pierce to speak with the other members of the team and get their input and recommendations. Pierce spoke with Qasim who expressed some concern and suggested contacting Ross directly. This suggestion was rejected. Qasim then left the office on business. Qasim's initial reaction was understood by

DRC as an expression of concern and an acknowledgment that there was potentially a problem. The third member of the interview team, Soulari was contacted, and she recommended hiring Arnett. East was again consulted. She told Pierce to contact Qasim to see if she had any additional input. East also asked Pierce to call Arnett's references.

13. Qasim was unavailable during the day, even though calls were made to her cell phone and finally her home phone in the evening. Arnett's references were positive. When Qasim was finally contacted she stated that she wanted to offer the job to Ross regardless of his references. With good references and two out of three members of the hiring team strongly in favor of Arnett, East decided to offer Arnett the position.

14. When Qasim learned that East decided to offer the position to Arnett, she complained to East. Qasim complained that she was not involved in the final decision and did not feel that poor communication skills were a sufficient reason to not hire Ross.

15. East was unpersuaded by Qasim's arguments and stood by her decision to offer the position to Arnett.

16. In July, Baker and East decided to transfer Qasim to the Information Services Team. The new position on the Information Services Team was a lateral transfer with the same pay and benefits. Baker and East decided the transfer was in the best interest of DRC because of the ongoing personality conflict between Pierce and Qasim, and Qasim's performance issues.

18. Qasim objected to the transfer to the Information Services Team and filed a grievance. Because she objected, Qasim was allowed to remain in her position as Advocate/Investigator.

19. In August 2004, the United States Administration on Developmental Disabilities conducted an audit of DRC to review DRC's administration of its federally funded programs.

20. In preparation for the audit, Baker discovered that Qasim was still not satisfactorily documenting her monitoring activities. The USADD expressed concern regarding the lack of documentation and told East that she needed to correct the problem.

21. Qasim was terminated on September 2, 2004 for reasons unrelated to her race or her complaints of race discrimination.

22. Qasim incurred a loss of back pay of $25,105.60 (Pl. Ex. 39).

## Conclusions of Law

23. DRC was Qasim's employer as that term is defined by Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.

24. DRC has stated a legitimate and nondiscriminatory reason for its employment decisions related to Qasim's including her termination.

25. Qasim has failed to prove that defendant's reasons for its employment actions and for her terminated employment are a pretext for retaliation or intentional discrimination based on race.

26. Qasim has failed to prove that her termination was motivated in whole or in part by her race or retaliation.

A separate judgment will be entered in favor of Disability Rights Center, Inc., dismissing the complaint of each plaintiff with prejudice.

IT IS SO ORDERED THIS  24  day of May, 2006.

_____
James M. Moody
United States District Judge